HALL, Chief Judge.
The defendant, Carlton Taylor, Jr., was convicted by a jury of aggravated burglary in violation of LSA-R.S. 14:60 and aggravated rape in violation of LSA-R.S. 14:42. On the burglary charge, defendant was sentenced to thirty years at hard labor and on the rape charge, defendant was sentenced to life imprisonment, with the sentences to run concurrently.
On appeal, defendant raises the following issues:
1. Whether the trial court erred in allowing Deputy Charlie Frazier of the DeSoto Parish Sheriff’s Department to qualify as an expert in the field of fingerprint identification;
2. Whether the trial court erred in denying defendant’s motion for a mistrial based on the victim’s reference to other crimes evidence; and
3. Whether the state failed to prove beyond a reasonable doubt that defendant committed the crimes with which he was charged.
Finding no merit to defendant’s assignments of error, we affirm his convictions and sentences.
ISSUE NUMBER ONE
Lt. Charlie Frazier of the DeSoto Parish Sheriff’s Department was qualified as an expert in the field of fingerprint identification and testified concerning fingerprints found at the scene of the crimes. Defendant argues that the trial court should not have allowed Lt. Frazier to qualify as an expert in light of testimony from Lt. Judson Rives of the DeSoto Parish Sheriff’s Department that “our people have been trained but we go to the experts,” referring to Major Taylor at the Crime Lab.
Lt. Rives, who testified concerning Lt. Frazier's qualifications, explained that Lt. Frazier was trained in fingerprint identification but did not have the years of experience that Major Taylor had. Before Lt. Frazier was allowed to testify as an expert, both defense counsel and the prosecution questioned him concerning his qualifications. Officer Frazier attended fingerprint identification school at the Northwest Loui *989 siana Crime Lab in 1976. In 1984 he studied forty hours of basic fingerprinting technique and forty hours of advanced fingerprinting taught by the FBI at the LSU Law Enforcement Institute. According to Lt. Frazier, he has checked fingerprints in the field “numerous times.”
A witness who seeks to testify as an expert must establish that he has special knowledge of the subject about which he is called upon to testify. LSA-R.S. 15:466. The competence of an expert witness is a question of fact which is within the sound discretion of the trial court. Rulings on the qualification of expert witnesses will not be disturbed unless they are manifestly erroneous. State v. Drew, 360 So.2d 500 (La.1978), appeal dismissed, cert. denied, 439 U.S. 1059, 99 S.Ct. 820, 59 L.Ed.2d 25 (1979); State v. Mims, 501 So.2d 962 (La.App. 2d Cir.1987); State v. White, 430 So.2d 171 (La.App. 2d Cir.1983), writ denied, 433 So.2d 1055 (La.1983).
Based on Lt. Frazier’s training in excess of eighty hours and his field experience, the trial court was not manifestly erroneous in accepting him as an expert in the field of fingerprint identification.
ISSUE NUMBER TWO
Defendant claims that the trial court erred in failing to grant his motion for a mistrial after the victim testified that some months prior to the date of the burglary and rape, defendant had been at her house and “couldn’t keep his hands off of me.” Defendant asserts that this was an improper reference to other crimes evidence, the introduction of which the state had failed to advise him as required by State v. Prieur, 277 So.2d 126 (La.1973) and LSA-C.Cr.P. Art. 720.
Evidence of other crimes is generally not admissible except under certain circumstances. LSA-R.S. 15:445-48. In State v. Barham, 467 So.2d 880 (La.App. 3d Cir.1985), writ denied, 475 So.2d 355 (La.1985), the Third Circuit held that testimony by a rape victim that the defendant required her and her brother to remove their swimsuits and engage in assorted games on the day of the rape was not a reference to criminal conduct because such games did not violate any criminal statutes. Therefore, the testimony was admissible in the defendant’s prosecution for forcible rape despite the lack of Prieur notice and was relevant to show his prurient interest in the victim.
In the present case, the victim’s unsolicited testimony that defendant could not keep his hands off of her does not advert to any conduct which is violative of a criminal statute; therefore, there was no requirement that the state give Prieur notice. Such testimony tended to show defendant’s prurient interest in the victim.
ISSUE NUMBER THREE
Defendant argues that the state failed to prove beyond a reasonable doubt that he committed the crimes with which he was charged because there was no positive identification of him as the assailant.
In order to satisfy due process standards, the record evidence, viewed in the light most favorable to the prosecution, must be sufficient for a rational juror to conclude that the essential elements of the crime were proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); LSA-C.Cr.P. Art. 821; LSA-R.S. 15:438.
At trial, the victim testified that on the night of August 8, 1985, she was at her home in Mansfield, Louisiana lying on the sofa bed in the living room with her two children when she fell asleep watching television around 11:00 p.m. She awoke when the television went off and as she started to get up, she was grabbed around the neck by a man saying “don’t scream, I have a knife.” The victim could not see her assailant’s face because she shut her eyes, but not before she saw “a shining blade up in the air.” The assailant, still holding her throat, backed her up into the adjacent bedroom and partially laid her on the bed while continually telling her not to scream. According to the victim, she did not attempt to resist when her assailant engaged in sexual intercourse with her because he had a weapon and she feared not only for her own life, but also for the lives of her children.
*990 After completing the act of intercourse, the assailant placed a pillow over the victim’s face, told her he had a gun, and then left. The victim lay on the bed for a few minutes, then got up and looked in the kitchen where she saw a screen had been pulled off the window and the telephone cord had been cut. She took the two children across the street to J.T. Henderson’s home at approximately 12:40 a.m. and telephoned her mother. She arrived at her mother’s home at approximately 1:05 a.m. and called the police. After the police arrived, the victim was taken to the hospital where a rape kit was performed.
Mr. Henderson’s son, William, was awake watching television when the victim arrived. He testified that he had seen a Trans-Am or Z-28 parked in front of the victim’s home with its parking lights on .and then later he saw the car drive off. After viewing pictures of defendant’s car which is a metallic orange Trans-Am, Henderson testified that it looked like the car he saw at the victim’s house, but he could not be sure it was the same car because he had not been able to see the color of the car.
The victim testified that several months prior to the rape and burglary, she was at home with a friend, Thelma Green, when defendant, who was employed as a meter reader by Cleco, came to read her meter. Thelma began to question defendant concerning her gas bill and subsequently invited him into the victim’s home. Defendant came inside for a short period of time. Several days later, defendant was in the neighborhood at a wedding reception and stopped by the victim’s home with a friend for a brief period of time. According to the victim, he could not keep his hands off of her. The victim’s testimony that defendant was in her home on the two occasions was corroborated by Thelma Green.
On the day following the rape, the victim told the police that the voice of her assailant was familiar. Later, Lt. Rives, the investigating officer, played a tape recording of defendant’s voice for her. At first, she was not sure if it was her assailant’s voice; however, she later identified defendant’s voice as that of her assailant.
Shelby Smith, Keith Woods, and Jimmy Bledsole all testified that they saw a car resembling defendant’s car parked behind the Cooper’s Cowboy Store sometime between 11:30 and 1:00 on the night of the crimes. Smith and Woods testified that the car drove off in the direction of the victim’s home. Bledsole testified that the car left Cooper’s and went to the victim’s home where a man got out leaving his parking lights on, went onto the victim’s porch, and stayed a few minutes before leaving. Although none of these witnesses could identify the driver of the car, all three were able to identify the defendant’s car as the one they had seen at Cooper’s based on its unusual orange color, shiny mag wheels, tinted windows, black painted front grill, and the vinyl parts on the back windshield. However, the witnesses admitted that the lighting that night, consisting of a Coke sign or Coke machine, was poor and they could be mistaken about the color of the vehicle.
Lt. Charlie Frazier testified that he was able to lift fingerprints from the screen window through which the assailant entered the victim’s home. He compared these with the defendant’s fingerprints and found nine points of identification that matched points on the fourth finger of the defendant’s right hand. Lt. Frazier testified that in making a positive identification, he does “not feel comfortable with less than ten points of identification” even though the FBI only requires a minimum of six points of identification. Due to lack of equipment, Lt. Frazier was unable to preserve the fingerprints, and they dissipated before he was able to conduct any further tests. Lt. Frazier did not positively identify the fingerprints found on the screen as those of defendant’s but did state that they were not inconsistent with defendant’s fingerprints.
Laura Johnson of the North Louisiana Crime Lab, an expert in forensic serology, testified that she detected seminal fluid on a dishtowel wrapped around a kitchen knife which Lt. Rives found in the victim’s back *991 yard and the victim identified as her own. Johnson also detected seminal fluid on the victim’s nightgown, on the bedspread, and on a vaginal swab of the victim. Analysis of this seminal fluid along with blood and saliva from both defendant and the victim, led Johnson to conclude that defendant fell within two percent of the black population having the combination of blood type found in the seminal fluid.
Defendant, who lives in Coushatta, testified that on the night of the crimes he was in Mansfield with his girlfriend from approximately 10:45 until 12:00 before returning home at approximately 12:45 a.m. After arriving at his home, he washed and wiped off his car before going inside at approximately 1:05 a.m. Defendant’s girlfriend, Janice Spencer, testified that defendant was with her in Mansfield from 10:45 until 12:00. Defendant’s wife testified that defendant left home sometime in the evening while she was away but she was not sure of the exact time when he returned although “it wasn’t late at all.” Mrs. Taylor testified that she put her nephew to bed at 12:30 a.m. and “it wasn’t a good five minutes between there” before defendant arrived. She was lying down but not asleep when he came home.
According to Lieutenant Rives and Jeffrey Hall, defendant’s supervisor, when questioned by Lt. Rives in Hall’s presence, defendant originally denied being in Mansfield on the night of the crime, claiming that he was at home with his family in Coushatta. Defendant claims that he never denied being in Mansfield on that night.
Although defendant recalls discussing their gas bills with Thelma Green and maybe with the victim, he denies that he visited the victim on the day of the wedding reception or that he has ever been inside her house. Defendant also testified that he did not go near the victim’s house or in the vicinity of Cooper’s Cowboy Store on the night of the crimes. Additionally, defendant stated that he has seen another car similar to his in Mansfield.
In summary, the evidence presented by the state consisted of the victim’s identification of defendant’s voice as that of her assailant, testimony by four witnesses that they saw a car resembling defendant’s unusual vehicle at or in the vicinity of the victim’s home on the night the crimes occurred, testimony that defendant was in Mansfield about the time the victim was attacked, scientific evidence that defendant fell within two percent of the black population which could have secreted the seminal fluid found on items in the victim’s home and the victim herself, and a fingerprint found on a window screen at the victim’s home with nine points of identification matching one of defendant’s fingerprints. When viewed in the light most favorable to the prosecution, the evidence was sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant committed the crimes of aggravated rape and aggravated burglary.
DECREE
The defendant’s convictions and sentences are affirmed.
AFFIRMED.